

FILED

APR 0 5 2017

CARMELITA REEDER SHINN
CLERK, U.S. DISTRICT COURT
BY _____
DEPUTY

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

STEPHEN CRAIG BURNETT )
    Plaintiff )
                  )    Case No. **CIV-17-385-M**
v. )
                  )
MARY FALLIN, )
KEVIN GROSS, )
MICHAEL ROACH, )
FRAZIER HENKE, )
GENE HAYNES, )
TODD HOLDER, )
IRMA NEWBURN, )
MATT TILLY, )
JOE ALLBAUGH, )
ROBERT PATTON, )
JASON BRYANT, )
JANET DOWLING, )
ROBERT DOKE, )
TERRY CLINE, )
    Defendants )

## PRO SE PRISONER CIVIL RIGHTS COMPLAINT

**I.** Jurisdiction is asserted pursuant to:

    42 U.S.C. 1983
    28 U.S.C. 1343 (a)(3)
    28 U.S.C. 1367
    28 U.S.C. 2201
    28 U.S.C. 2202

**II.** Plaintiff is a convicted and sentenced state prisoner.

**III.** Previous Federal civil actions or appeals.

    See following pages.

**III.  continued:**

1) Prior civil action/appeal no. 1:
   - (a) Parties to previous lawsuit:
        Plaintiff: Stephen Craig Burnett, #224242
        Defendants: Lewis Harris, John Selph, Robert Dick, Stanley Glanz, William Thompson, Brian Edwards, Russell Harris.

   - (b) Court and Docket No:  U.S. District Court for the Northern District of Oklahoma, CIV-95-825-K.

   - (c) Approximate date of filing: 08/24/95

   - (d) Issues Raised:  Denial of lst, 8th, 14th Amendment rights while incarcerated in the Tulsa County Jail as a pretrial detainee.

   - (e) Disposition:  Defendants granted summary judgment on 08/08/16.  Appealed to 10th Circuit, Case no. 96-5202 on 09/16/96.  Dismissed for failure to Prosecute on 03/07/97.

Prior civil action/appeal no. 2:
   - (a) Parties to previous lawsuit:
        Plaintiff: Stephen Craig Burnett, #224242
        Defendants: Stephen Kaiser, Judy Cheatwood, Bill Knowles, Charles Brewer.

   - (b) Court and Docket No:  U.S. District Court for the Eastern District of Oklahoma, CIV-00-377-S.

   - (c) Approximate date of filing: 07/l9/00.

   - (d) Issues Raised:  Denial of books, newspapers, magazines and retaliation.

   - (e) Disposition:  Defendants granted summary judgment on 09/20/01.  Appealed to 10th Circuit, Case no. 01-7135, dismissed on 12/17/01.

Prior civil action/appeal no. 3:
   - (a) Parties to previous lawsuit:
        Plaintiff: Stephen Craig Burnett, #224242
        Defendants: Justin Jones, Debbie Morton, Joseph Taylor, John Middleton, Robin Roof, Kathy Jones, Linda Jester, Joseph Sebenick, T. Battles, Ray Choate.

   - (b) Court and Docket No:  This court, CIV-10-257-M.

   - (c) Approximate date of filing: 05/13/10.

(d) Issues Raised:  Interference with legal mail, retaliation, denial of free speech, prescribed medication, right to practice Jewish religion, privacy, and confidential communications with attorney, safe environment, grievance abuse.

(e) Disposition: Defendants granted summary judgment on 12/09/10.  Appeal to 10th Circuit, Case No. 10-6285 on l2/17/10, relief denied on 08/31/11, 437 Fed. Appx. 736 (10th Cir. 2011).  Petition for Writ of Certiorari in U.S. Supreme Court, Case No. 11-7585.  Certiorari denied on 02/21/12.

4) Prior civil action/appeal no. 4:
   (a) Parties to previous lawsuit:
       Plaintiff:  Stephen Craig Burnett, #224242
       Defendants:  Justin Jones, Joseph Taylor

   (b) Court and Docket No.  This court, CIV-10-470-M.

   (c) Approximate date of filing:  05/06/10.

   (d) Issues Raised:  Conditions of confinement while on lockdown.  Request for Declaratory Judgment and Injunctive Relief only.

   (e) Disposition:  Plaintiff was transferred to render case moot.  Decided 03/31/10. Appeal to 10th Circuit, Case No. 11-6093.  Relief denied 12/11/11.

5) Prior civil action/appeal no. 5:
   (a) Parties to previous lawsuit:
       Plaintiff:  Stephen Craig Burnett, #224242
       Defendants:  Kim Leatherwood, Joseph Taylor, Joseph Sebenick, Michael Munday, Kathy Jones, Debbie Morton.

   (b) Court and Docket No:  This court, CIV-10-769-M.

   (c) Approximate date of filing:  07/20/10.

   (d) Issues Raised:  Denial of due process and equal protection, denial of free speech, Retaliation.

   (e) Disposition: Defendants granted summary judgment on 02/23/12.  Appeal to 10th Circuit, Case No. 11-6264.  Relief denied.

6) Prior civil action/appeal no. 6:

   (a) Parties to previous lawsuit:
       Plaintiff:  Stephen Craig Burnett, #224242
       Defendants:  Kathy Miller, Raymond Larimer, Nancy Colpetzer, Mark Reiheld.

    (b) Court and Docket No:  U.S. District Court for the Eastern District of Oklahoma, CIV-12-158-RAW-SPS.

    (c) Approximate date of filing:  04/09/12.

    (d) Issues Raised:  Denial of prompt and adequate medical care, retaliation.

    (e) Disposition:  Dismissed on 08/25/14, partly on summary judgment, partly for failure to state a claim.  Appealed to 10th Circuit, Case No. 14-7069, partly remanded on 11/20/15.  Case is still pending.

7) Prior civil action/appeal no. 7:

    (a) Parties to previous lawsuit:
        Plaintiff:  Stephen Craig Burnett, #224242
        Defendant:  Oklahoma Department of Corrections.

    (b) Court and Docket No:  This court, CIV-16-609-M.

    (c) Approximate date of filing:  06/06/16.

    (d) Issues Raised:  Illegality of DOC religious policy OP-030112 and attachments.

    (e) Disposition:  Case is still pending.

8) Prior civil action/appeal no. 8:

    (a) Parties to previous lawsuit:
        Plaintiff:  Stephen Craig Burnett, #224242
        Defendant:  Oklahoma Department of Corrections.

    (b) Court and Docket No:  This court, CIV-16-1140-M.

    (c) Approximate date of filing:  September, 2016.

    (d) Issues Raised:  Illegality of DOC grievance policy OP-090124.

    (e) Disposition:  Case is still pending.

**IV.** Parties to current lawsuit.

1. Plaintiff: Stephen Craig Burnett, #224242, James Crabtree Correctional Center, 216 N. Murray Street, Helena, OK 73741.

2. Defendant No. 1: Mary Fallin, Governor of Oklahoma, State Capitol, 2300 N. Lincoln Blvd., Oklahoma City, OK 73105. Sued in individual and official capacity.

3. Defendant No. 2: Kevin Gross, member of Oklahoma Board of Corrections, 3400 Martin Luther King Ave., Oklahoma City, OK 73111. Sued in individual and official capacity.

4. Defendant No. 3: Michael Roach, member of Oklahoma Board of Corrections, same address as above. Sued in individual and official capacity.

5. Defendant No. 4: Frazier Henke, member of Oklahoma Board of Corrections, same address as above. Sued in individual and official capacity.

6. Defendant No. 5: Gene Haynes, member of Oklahoma Board of Corrections, same address as above. Sued in individual and official capacity.

7. Defendant No. 6: Todd Holder, member of Oklahoma Board of Corrections, same address as above. Sued in individual and official capacity.

8. Defendant No. 7: Irma Newburn, member of Oklahoma Board of Corrections, same address as above. Sued in individual and official capacity.

9. Defendant No. 8: Matt Tilley, member of Oklahoma Board of Corrections, same address as above. Sued in individual and official capacity.

10. Defendant No. 9: Joe Allbaugh, Director of Oklahoma Department of Corrections, same address as above. Sued in individual and official capacity.

11. Defendant No. 10. Robert Patton, former Director of Oklahoma Department of Corrections. Address to be obtained upon discovery or from attorney of other Defendants. Sued in individual and official capacity.

12. Defendant No. 11: Jason Bryant, Warden of James Crabtree Correctional Center, 216 N. Murray Street, Helena, OK 73741. Sued in individual and official capacity.

13. Defendant No. 12: Janet Dowling, former Warden of James Crabtree Correctional Center, now Warden at the Dick Connor Correctional Center, P.O. Box 220, Hominy, OK 74035. Sued in individual and official capacity.

14: Defendant No. 13: Robert Doke, State Fire Marshall, 2401 N.W. 23rd Street, Suite 4, Oklahoma City, OK 73107. Sued in individual and official capacity.

15:  Defendant No. 14:  Terry Cline, Commissioner of State Health Department, 1000 N.E. 10th
Street, Oklahoma City, OK  73117.  Sued in individual and official capacity.


NOTE: Plaintiff is seeking both monetary damages and prospective declaratory and injunctive
relief.  That is why he is suing in both individual and official capacities.




**V.**  Cause of action.

### CLAIM NUMBER ONE

ALL DEFENDANTS EITHER DENIED OR CONDONED THE DENIAL OF
PLAINTIFF'S CONSTITUTIONAL OR STATE LAW RIGHT TO A SAFE AND HEALTHY
ENVIRONMENT DUE TO PRISON OVERCROWDING AND UNDERSTAFFING.

The Defendants have been fully aware of the seriousness of the statewide prison
overcrowding and understaffing problem for many, many years but failed to take effective
corrective action out of deliberate indifference.

The Legislative Service Bureau of the Oklahoma Legislature paid $844,000 for a
comprehensive performance audit of DOC.  MGT of America, Inc. issued its final 285 page
report dated 12/31/07 on 01/04/08.  See exhibit _1_ .  Chief among its recommendations was that
DOC contract for more private prison beds to east its critical overcrowding problem, and that the
Governor be removed from active participation in the parole process.  The report stressed the
desperate need for additional bedspace and an adequate ratio of Correctional Officers to inmates
to ensure the safety of the public, inmates, officers, and staff.  Yet years went by with no
appropriate corrective action.  If anything, the overcrowding and understaffing problem is worse
today than it was prior to the MGT report.

As of early 2014, all Oklahoma DOC operated prisons were operating at (or over) their
design capacity.  This is evidenced by the fact that DOC had to house thousands of inmates in
private prisons.  Meanwhile, DOC was paying the various county jails a daily rate for all inmates
housed there who had already been sentenced and waiting for prison bedspace, approximately
3,400.  This was very costly.

Soon after Robert Patton was hired as the DOC Director in 2014, he made the decision to
immediately transfer all of the DOC inmates housed in the county jails to DOC operated prisons
as a purely cost savings measure.  See attached exhibits _10,11, 13,19_ This was done with the
knowledge and approval of Governor Mary Fallin.  There was no consideration for the extreme

6

and immediate overcrowding and understaffing it would cause statewide.  This action was the epitome of deliberate indifference towards the risk of serious harm to Plaintiff, thousands of other inmates, Correctional Officers, staff, and the risk to public safety due to increased risk of escape.

Since that time, the Board of Corrections and DOC Director Robert Patton did not even request a large enough budget increase to either build new prisons, or pay to rent private prisons to resolve the unconstitutional conditions of confinement  Defendant Patton went so far as to publicly state that the DOC could "get by" on the same budget as the previous years. See attached exhibit __6, 13__.  This proves the deliberate indifference of Director Patton and the members of the Board of Corrections who condoned Patton's position on the budget request(s).  They simply allowed the problem to continue year after year.  This is proven by the fact that the current DOC Director, Joe Allbaugh, has requested a huge increase  for the 2017 DOC budget.  A comparison of Director Patton's budget request to Director Allbaugh's budget request will show the deliberate indifference of defendants Patton, Fallin, and all of the members of the Board of Corrections.

Plaintiff asserts that the prison overcrowding and understaffing is a problem at all DOC operated medium security prisons.  It is not just at the James Crabtree Correctional Center (JCCC) in Helena, OK where he is incarcerated.  In other words, transferring Plaintiff will not resolve the problem.  It would only be an act of retaliation.

Plaintiff does assert however, that the problem is more severe at  JCCC because it is the only medium security facility which has open dorm housing units.  Only 1 of the 6 housing units at JCCC has two man cells, and the doors do not lock on that unit (Unit 6).  The doors could be made to lock, in order to lock down troublemakers, but Wardens Janet Dowling and Jason Bryant have not done that.  Unit 6 is also the only unit which is fenced and has a gate which locks.  In other words, the inmates in Unit 6 could be kept separate from the rest of the facility if this was warranted for security reasons, but Wardens Dowling and Bryant have not done that.  During 2016, a JCCC staff member "lost" a set of keys to the housing unit doors and other doors and locks.  It was reported that some inmate made replica keys, and inmates were  caught going out locked unit doors.  The facility was put on lockdown until the maintenance department made changes in the doors.  Inmates were also caught climbing out of the windows in some of the housing units to retrieve "packages" of contraband thrown over the fence into the facility when the facility was locked.   Fences could be installed around any of the other housing units to segregate troublemakers, but that has also not been done by Wardens Dowling and Bryant. Instead of just punishing inmates who violate rules, Wardens Dowling and Bryant consistently impose blanket punishment.  Hundreds of inmates who did no wrong are consistently punished for the actions of a few, identified inmates.  This causes widespread anger and frustration, leading to further tension.  One housing unit at JCCC, unit l, never has a Correctional Officer on duty inside, and the exit door is not locked.  This is designated as an "honor dorm".  DOC Directors Patton and Allbaugh are fully aware of the conditions at JCCC by personal visits to JCCC, and reports regularly submitted to them by the Wardens and various other inspectors from the State Fire Marshal and the Health Department, and by inmate grievances and lawsuits.

In October of 2016, DOC Director Joe Allbaugh visited JCCC and went inside the housing units, including Unit 5 where Plaintiff is housed. He witnessed the extreme overcrowding situation, with 3 men crammed into a tine cubicle designed for 1 man, but normally housing 2 men. Some cubicles had a bunkbed installed, such that there are 3 men inside some cubicles. Nothing was changed until late January of 2017.

On 11/15/16 David Parker, DOC Regional Manager, visited James Crabtree Correctional Center (JCCC) and personally went inside the housing units, including Unit 5 where Plaintiff is housed. He witnessed the extreme overcrowding situation, with 3 men crammed into a tiny cubicle designed for 1 man, but normally housing 2 men. Some cubicles had a bunkbed installed, such that there are 3 men in some cubicles. Nothing was changed.

On 11/17/16 all of the members of the Board of Corrections (Defendants in this case) visited James Crabtree Correctional Center and also personally went inside the housing units, including Unit 5 where Plaintiff was housed. They also witnessed the above. They cannot claim lack of personal knowledge. Nothing was changed. The Board of Corrections governs the Department of Corrections per 57 O.S. 503.

On 01/30/17 Plaintiff was moved from JCCC housing unit 5 to an upstairs bunk in unit 3. Unit 3 is even more crowded than unit 5 and the ratio of inmates to sinks, toilets and showers was worse than on unit5. The living conditions are terrible in all aspects. There is virtually no unencumbered bedspace per inmate.

In January of 2017, it was reported that the U.S. Department of Justice had contacted DOC Director Joe Allbaugh and Governor Mary Fallin about the critical overcrowding in the statewide DOC prison system. Reportedly, the DOJ ordered Oklahoma to substantially reduce the inmate population within 120 days. Some transfers of inmates from JCCC did begin in late January, 2017.

On 01/27/17 DOC Director Allbaugh was quoted on television station OETA, stating that if the prison overcrowding situation was not resolved "there will be deaths". Director Allbaugh made that statement in support of his budget request for 3 times what the previous budget was. He stated that he had been contacted by the U.S. Department of Justice in this regard.

Plaintiff alleges that the past and present DOC Directors, Wardens, and members of the Board of Corrections receive periodic inspection reports of all DOC facilities, including JCCC where Plaintiff is incarcerated. These include inspection reports by the State Fire Marshall, Robert Doke, and by the State Health Department Commissioner, Terry Cline and show serious violations of state law regarding bedspace per inmate, air quality and circulation, ratio of sinks, toilets, urinals and showers per inmate, ratio of Correctional Officers to inmates, and other state law and federal law violations. These reports have been steadfastly ignored by all of the defendants out of deliberate indifference. Plaintiff alleges that there have been a series of conversations and communications amongst all of the Defendants regarding the above violations, but all have claimed there is an insufficient budget to provide constitutional conditions of confinement. This is well documented in the media. See exhibits 6, 7, 10, 11, 13, 14, 15, 18, 19, 20, 22, 24, 27, 28, 29

Oklahoma state law 22 O.S. 1514 states that "It is the goal of the Department of Corrections to provide <u>adequate prison space</u> to ensure that those sentenced to prison will remain incarcerated......it is the mission of the Department to provide housing, clothing, food and medical care to its inmates, <u>to maintain a safe and secure prison system....</u>" Plaintiff alleges that the members of the Board of Corrections and Department of Corrections listed as Defendants are denying Plaintiff his right to adequate prison space and his right to a safe and secure prison system. Defendant Fallin is well aware of this, but apparently condones it.

A supervisory official can be held liable for 8th Amendment claims of deliberate indifference when the official knows of and disregards an excessive risk to inmate health and safety, and there is an affirmative link between the constitutional deprivation and the supervisor's conduct. <u>Keith v. Koerner,</u> 707 F.3d 1185 (10th Cir. 2013); <u>Estate of Booker v. Gomez,</u> 745 F.3d 405, 435 (10th Cir. 2014). As set forth herein, all Defendants have long been aware of the critical overcrowding and understaffing at all Oklahoma prisons during the last two years. Numerous grievances and lawsuits have been filed on this issue, and there has been a very great deal of media publicity on this. But as the years have passed, the problem has gotten steadily worse, due to the deliberate indifference of the Defendants. Instead of taking affirmative corrective action, Governor Fallin has instead formed "committees" and "task forces" to "study" the problem. When these groups do make recommendations, such as the JRI recommendation, Governor Fallin has delayed or refused to follow them. She has also refused to use discretionary funds from revolving funds or "rainy day" funds to alleviate prison overcrowding.

The JRI was the most significant justice reform effort in recent history. But behind-the-scenes moves by Governor Fallin to take control of the JRI took place, in which the financial interests of private prison companies played a big role. Donations were made to the Governor's political campaign. Lobbyists were involved. The JRI was left in near shambles after Governor Fallin's office delayed carrying it out, reversed itself on seeking a federal grant, and essentially torpedoed it. High ranking state officials publicly stated that Governor Fallin' political desire to appear "tough on crime" and pressure from private prison groups ultimately curbed any real progress. The planned funding dropped, sentencing alternatives are not being carried out, fewer Pardon and Parole Board officers were added to monitor offenders. Crime reduction strategy training for local law enforcement agencies did not occur. The JRI has no official coordinator. Then House Speaker Kris Steele and Oklahoma County District Attorney David Prater resigned from the JRI Group in March of 2013, expressing frustration with Governor Fallins' office regarding the JRI. Kris Steele wrote that "It is difficult to believe the Governor remains highly committed to justice reinvestment when she unilaterally denies the funding and expertise needed to implement the policy". The JRI Oversght Group disbanded. Exhibits 2, 3, 4, 17        . The above described conduct of Governor Falllin was administrative in nature, thus she has no immunity for it. Her conduct regarding the use (or non use) of various revolving funds to alleviate prison overcrowding also falls into this category of deliberate indifference.

The Oklahoma Constitution gives the Governor the authority to grant clemency. The Constitution does not put any rules or regulations or restrictions on this. Governor Fallin has the legal authority to release as many inmates as she wants to. This could be done to alleviate overcrowding via supervised release, perhaps with GPS ankle bracelets with routing reporting and drug testing of those so released. Inmate candidates for early release could include those

with non-violent crimes, the elderly, disabled, those having serious medical conditions, and those demonstrating outstanding conduct while incarcerated. But Governor Fallin has steadfastly refused to do this out of political concerns, with no regard to the unconstitutional conditions of confinement at issue in this case. It is clear that only federal court intervention will resolve this critical statewide problem.

The inmate population at JCCC is predominantly elderly. For many years prior to 2014, there was a practice of screening new arrivals to review their disciplinary history and gang membership or affiliation. Potentially dangerous or predatory inmates were not allowed to enter the general population and were transferred elsewhere. This was due to the facility's designation as being for elderly, vulnerable inmates and the open dorm housing situation. Open dorms are known to be much more dangerous than facilities with 2 man cells which can be locked down at any time. There is no way to lock down an open dorm. Members of rival gangs are housed in the same open dorm, as are predatory versus vulnerable elderly inmates. Prior to late 2016, there were no security cameras inside the housing units. What the staff at JCCC calls a "lockdown" is simply keeping the housing doors locked and not letting inmates go outside.

Since 2014, a steady stream of illegal contraband has flowed into the facility by being thrown over the perimeter fence, coordinated by the huge number of cellphones in possession of JCCC inmates. This includes drugs, tobacco, cellphones, weapons and escape paraphernalia. This is well known to Wardens Dowling and Bryant, and by DOC Directors Patton and Allbaugh. It is also well known by the Alfalfa County Sheriff's Department and the Oklahoma Highway Patrol who have chased and arrested many people doing this or attempting to do it. But no one has taken any effective measures to prevent this. Prison in other states have found ways of preventing this. This is also well known by the public due to newspaper and television reports. It is not a secret. See exhibits __18__ .

Most violence in prison revolves around drug activity and associated gang rivalry. With so many drugs and other contraband steadily flowing into JCCC and the other state prisons, it is not surprising that there have been so many robberies and assaults on vulnerable inmates by inmates who have to pay their drug debts. The fact that this has been allowed to continue for so long and so publicly proves the deliberate indifference of all Defendants towards Plaintiff's risk of serious harm. It is a continuing violation of Plaintiff's constitutional right to a safe living environment. U.S.C.A. 8.

Plaintiff alleges that the highest ranking JCCC officials do not have the required qualifications for their position(s). This includes the Warden(s), Deputy Warden(s), housing unit managers and case managers. Their lack of educational training and on-the-job training in the areas which they supervise is a prime cause of many of the problems at JCCC. The DOC Director(s) and the members of the Board of Corrections are at fault for failing to train, monitor and supervise their subordinates. Keith v. Koerner, supra.

Plaintiff is housed in an open dorm at JCCC. It is divided into two housing pods, one housing 110 inmates and the other 120 inmates, for a total of 230. There is only one Correctional Officer to monitor 230 inmates, inside and the immediate area outside. It is literally impossible for one Officer to monitor 3 locations at once. Until late 2016, there were no security cameras

inside the housing units. At the chow hall were Plaintiff eats meals 3 times a day, there is often no Officer inside to monitor 250 inmates. This is unconstitutionally dangerous, and exposes Plaintiff to a constant concern of assault. He has witnessed several assaults in his housing unit and in the chow hall, and has been threatened with assault.

The federal courts have long held that unsafe conditions that "pose an unreasonable risk of serious damage to a prisoner's future health" may violate the 8th Amendment, **even if the damage has not yet occurred** and may no affect every prisoner exposed to its conditions. **"A remedy for unsafe conditions need not await a tragic event".** Hellling v. McKinney, 509 U.S. 25, 113 S.Ct. 2475 (1993).

A prisoner who is subjected to a risk of assault, **but is not actually assaulted,** can recover damages in certain circumstances. Benefield v. McDowall, 241 F.3d 1267, 1271 (10th Cir. 2001); Hobbs v. Lockhart, 46 F.3d 864, 866, 869 (8th Cir. 1995). A prisoner **need not wait until an assault has occurred** before obtaining injunctive relief. Farmer v. Brennan, 511 U.S. 825, 845, 114 S.Ct. 1970 (1994). Plaintiff is seeking both monetary damages and injunctive relief in this case.

When she was the JCCC Warden, Janet Dowling was quoted in a newspaper article as saying that "I can tell you my staffing level on the best days is 15 on the day shift and 12 on the night shift to watch 1,010 inmates". See exhibit _9, page 2_ . Warden Dowling was citing the total number of officers on duty, not just those actually monitoring the housing units, which is 1 officer to monitor about 230 inmates. At almost every meal at JCCC, there is only 1 Correctional Officer, and sometimes none, to monitor over 250 inmates. Plaintiff has witnessed fights and assaults inside the chow hall.

In Brown v. Plata, 131 S.Ct. 1910 (2011) the U.S. Supreme Court held that there was an exceptional degree of overcrowding when as many as 200 prisoners live in a gymnasium, monitored to as few as two or three Correctional Officers.

The federal courts have long recognized that a lack of funding is not an acceptable excuse for depriving inmates of their constitutional rights. Ramos v. Lamm, 639 F.2d 559, 573 (10th Cir. 1980); Battle v. Anderson, 447 F.Supp. 516, 525 (ED OK 1977); Wilson v. Seiter, 501 U.S. 294, 111 S.Ct. 2321, 2330 (1991). But Governor Fallin, the members of the Board of Corrections, and the Department of Corrections defendants listed in the case consistently blame the lack of funding as their excuse for knowingly violating Plaintiff's and other inmates' constitutional rights to a safe and health environment. Those mostly to blame, the members of the state legislature, claim legislative immunity to shield themselves. Someone has to be liable. If government fails to fulfill its obligation, the courts have a responsibility to remedy the resulting 8th Amendment violation. Brown v. Plata, supra; also Hutto v. Finney, 437 U.S. 678, 687, 98 S.Ct. 2565 (1978). Plaintiff asks that the court do so.

Prior to March of 2014, both sides of Plaintiff's housing unit had a dayroom, with four 4 man tables. Inmates housed in their tiny U shaped cubicles had a place to at least walk around. But when DOC Director Patton transferred about 3,400 inmates into the DOC system, the dayrooms were filled with bunks. These dayrooms were not designed for long term living.

Warden Dowling resolved the stated "dayroom capacity" posted in the dayrooms by the State Fire Marshal, by simply placing a new "dayroom capacity" sign with a substantially larger number of inmates over the previous sign.

   To make matters even worse, the tiny cubicles which had contained 2 inmates, had a bunkbed installed on one side, converting it into a 3 man cubicle. Plaintiff has no unencumbered space in his cubicle, in violation of both state law and federal law. Battle v. Anderson, supra. In Battle v. Anderson, the Federal court held that each resident living in a cell should have a minimum of 60 square feet of sleeping space, and each resident of a dormitory, 75 square feet. Square footage in cells is defined as the interior measurements of the dorm, minus any area devoted to bath facilities, program space, recreation space, office space, and minus a four foot wide fire corridor reaching from each bunk to the nearest exit. Also see Ramos v. Lamm, 639 F.2d 559, 573 (10th Cir. 1980) regarding required square footage.

   The courts have long recognized the inherent danger of housing medium security inmates, many of which are very violent and/or mentally unstable in open dorms such as Plaintiff lives in. Winton v. Board of Commissioers of Tulsa County, Okla., 88 F.Supp.2d 1244, 1266 (ND OK 2000); also Taylor v. Foltz, 803 F.Supp. 1261, 1264 (ED MI 1992). The courts have held that there should be a classification system to place more aggressive, higher security inmates in cell housing, rather than in open dormitories. Fisher v. Koehler, 692 F.Supp. at 1546-47, U.S. v. Wolfish, 439 F.Supp. 114, 126 (SD NY 1977); Ruiz v. Estelle, 503 F.Supp. 1265, 1282 (SD TX 1980). This has not been done at JCCC. Plaintiff represents that there are a large number of violent, dangerous and/or mentally unstable inmates housed in the open dorms of JCCC, including his housing unit. Some are members of prison gangs, and even members of rival prison gangs in the same housing unit. Many have life sentences and nothing to lose. This is a very dangerous environment, causing Plaintiff to live in constant fear.

   Inmates caught committing even the most serious rule or law violations are often not punished with a loss of earned credits or being put in disciplinary segregation. This is at the direction of Wardens Dowling and Bryant, due to the fact that the disciplinary segregation and protective custody cells are constantly filled. Inmates realize this, and are quick to take advantage of it. There is no incentive for good behavior, and no punishment for bad behavior. This has resulted in a very dangerous environment. If an inmate has been robbed or assaulted, he is often reluctant to report it, because staff will then confront the guilty inmate with this report and the reporter will be subject to violent retaliation.

   Oklahoma newspaper reports show that the ratio of Correctional Officers to inmates is the worst in the nation. See Exhibits _10, 15, 22, 28_   Such serious understaffing results in a huge security risk and dangerous environment. Newspaper reports also show that Oklahoma leads the nation in the homicide rate in prisons. See Exhibits _32, 33_ .

   Overcrowding and understaffing in the Oklahoma prison system is not something new. Federal court intervention and injunctions were issued in the past due to this very same problem. See Battle v. Anderson, 376 F.Supp. 402 (ED OK 1974); 447 F.Supp. 516 (ED OK 1977) and progeny. This is a continuing violation, caused by deliberate indifference of the Defendants towards the risk of serious harm to Plaintiff and others. Farmer v. Brennan, 511 U.S. 825, 114

S.Ct. 1970 (1994). U.S.C.A. 8. Courts may infer deliberate indifference on the part of prison officials by circumstantial evidence. Farmer v. Brennan, supra, also Wilson v. Seiter, 501 U.S. 294, 303-304, 111 S.Ct. 2321 (1991). A defendant need not know the precise nature of the risk to be found deliberately indifferent, as long as he knows that a serious risk exists. Valez v. Johnson, 395 F.3d 732, 736 (7th Cir 2005); Hope v. Pelzer, 536 U.S. 730, 738, 122 S.Ct. 2508 (2002). The Defendants in this case cannot claim that they have not long been aware of the serious risk caused by longstanding prison overcrowding and understaffing.

There are 7 sinks, 6 toilets and 1 urinal in the bathroom of Plaintiff's housing pod for 120 inmates. This violates the standards of health care established by the American Public Health Association and the international Plumbing Code Planning Standards. It also violates DOC policies and ACA standards. See 74 O.S. 192, 317 and DOC policies OP-030123 and OP-130107 U.S.C.A. 8. There is inadequate air ventilation and air circulation in Plaintiff's housing pod.

Plaintiff represents that there are periodic inspections of all housing units by a member of the State Fire Marshal's department, with written reports submitted to the State Fire Marshal, Robert Doke, and to Wardens Dowling and Bryant. The sub-standard conditions have been ignored by the above people out of deliberate indifference. State Fire Marshal Robert Doke has personally visited JCCC and is thus personally aware of the illegal conditions, but has abdicated his legal responsibility to enforce the state standards out of deliberate indifference. Plaintiff alleges that the State Fire Marshal and the Commissioner of the state Health Department are just as aware of the illegal conditions of confinement at JCCC as are the Warden(s) and DOC Director(s). Former JCCC inmate Kent Savage specifically named Robert Doke and Terry Cline as Defendants in his similar pending civil rights complaint in this court, CIV-16-1194-HE.

The same is true of Defendant Terry Cline, the Commissioner of the state Health Department. He is also personally aware of the periodic inspections at JCCC showing illegal conditions, but has also abdicated his responsibility to enforce the state standards out of deliberate indifference. He has been in communication with DOC officials about the sub-standard inspection reports at JCCC. See above.

There have been numerous communications between Defendants Doke and Cline with Wardens Dowling and Bryant, and with DOC Directors Patton and Allbaugh about the illegal conditions at JCCC during 2014, 2015 and 2016. The substance of these communications and inspection reports have been submitted to the Board of Corrections, but they have also failed to take appropriate corrective action out of deliberate indifference.

As it is today, Plaintiff and other inmates are simply warehoused, with forced idleness. The shortage of staff has caused programs to be eliminated or suspended, including the "Bridge Project" at JCCC. There are no staff members available to supervise programs, or to cover for one another when someone is sick, in training, or otherwise unavailable to do their job. Apparently this is the case with the JCCC mailroom. During 2016 incoming legal mail has not been delivered on a large percentage of the days when it should have been delivered, and the only facility mailbox is often not even emptied for days at a time. This violates DOC policies OP-030117 and OP-060115, and Plaintiff's 1st Amendment right. Both incoming and outgoing

legal mail is often delayed for an unnecessarily long time. Warden Bryant is well aware of this due to many inmate complaints and grievances, but has done nothing about it.

Almost all essential services at JCCC have been adversely affected by overcrowding and underfunding. The laundry does not have enough clothing to dispense to new arrivals, and no clothing to offer replacement clothing when it wears out or is torn, in violation of DOC policy. The medical area does not have enough staff to have anyone on duty after normal work hours or on weekends or holidays, except for the limited purpose of providing medication at Pill Line. Inmates going to Pill Line every day must stand outside in bad weather, because the budget does not allow construction of a sheltered area, with security addressed   Needed medical testing is not provided for budgetary reasons. Inmates' medication is often discontinued without any reason being given for budgetary reasons. Inmates needing new eyeglasses or dental work have to wait several months due to budgetary reasons. The maintenance department has been so overextended that it takes far too long to repair clogged toilets, fix holes in the roof, install new shingles on the roof, and so forth. The Food Services Department has had to cut the quantity and quality of meals due to budgetary reasons.

Governor Fallin has used her administrative authority to appoint members of the Pardon and Parole Board who are all former law enforcement officers or a former Judge known to impost harsh sentencing. Governor Fallin has made it publicly clear that she will not approve parole for any violent offenders and does not approve of parole for anyone. She has effectively rendered parole impossible. This has also been a primary cause of prison overcrowding. More and more inmates are entering the prison system with very large sentences, and very few are being released on parole. The math is simple. Governor Fallin is very obviously more concerned with the political ramifications of being considered "soft on crime" than she is with human civil rights and the impact on the ever increasing budget for the Department of Corrections to be paid by the taxpayers in a difficult economy. Governor Fallin's conduct regarding (not) granting clemency in the form of parole or commutations has had a very negative impact on the state's economy, especially given the fact that the state faces a huge budget shortfall. It would make much more sense to release low risk inmates on parole so that they could become working, productive taxpayers, instead of being a continual tax drain. There is also a large human toll. It is commonly known that family ties reduce recidivism and help stabilize people.

The situation has been recognized many times in the media during the last several years. "We're way out of line, and it's only getting worse" said Sean Wallace, director of the Oklahoma Corrections Professionals (OCP). "Our officers feel that right now they're just trying to keep things from getting completely out of control. There's no way to be proactive and do their jobs anymore". See Exhibit 14, 15, 18, 22. It was also reported in this article that inmates know when staffing levels are low and are quick to take advantage.

On page 65 of the November, 2016 issue of "Prison Legal News" Oklahoma DOC Director Joe Allbaugh was quoted as having said "I think in a lot of respects, we're not even in the 20[th] century. We've got facilities that are over 100 years old here. We have locks and doors that don't work". Such as housing units 1 and 6 at JCCC.

In October of 2016, current DOC Director Joe Allbaugh appeared on OETA's Oklahoma News Report. He stated that DOC is operating at 62% of its authorized staffing level, and that "the system is broken". He publicly acknowledged the critical state of overcrowding and the desperate need for a huge increase in the budget. He subsequently submitted a request for a budget increase of about three times the previous year's budget. It is very apparent that DOC Director Allbaugh knows that there is almost a zero chance of his getting that much of a budget increase, but at least he did make the request. Although the members of the State Legislature share a large part of the blame for this budget shortfall, they have been judicially granted "immunity" for their legislative actions. Judges who have granted themselves immunity have also granted these powerful politicians immunity by judicial decisions, not supported by actual statutes. This certainly appears to violate the Separation of Powers Doctrine. It is Plaintiff's belief that legislators elected by the citizens and paid by citizen taxpayers should have transparency and accountability. But they do not. They have immunity.

The U.S. Supreme Court has affirmed its position that when necessary, the courts have a responsibility to protect civil rights of prison inmates. Respect for the dignity of all persons animates the 8th Amendment prohibition against cruel and unusual punishment. Also see Article 2, Section 9 of the Oklahoma Constitution.

This court has the authority and the duty to ensure that the Constitution does not stop at the prison gate, but rather applies to the benefit of all, even those citizens behind prison walls. Battle v. Anderson, 447 F.Supp. 516, 525 (ED OK 1977); Finney v. Arkansas Board of Corrections, 505 F.2d 1194 (8th Cir. 1974). Plaintiff asks that this court take appropriate action, as was done in California recently.

As reported in Brown v. Plata, 131 S.Ct. 1910 (2011), the U.S. District Courts in California issued an Order requiring the Governor of California to reduce prison overcrowding in its prisons to remedy the lack of care available to prisoners. This Order required a prison population reduction of 38,000 to 46,000 inmates.

One of the findings in Brown v. Plata was that there was an exceptional degree of overcrowding when as many as 200 prisoners live in a gymnasium, monitored by as few as two or three Correctional Officers. As set forth above, Plaintiff represents that his housing unit with 230 inmates is monitored by only one officer, and in the chow hall with 250 inmates, there is often not any officer monitoring it

The prison population in Oklahoma has skyrocketed during the previous 15 year. But Oklahoma has not constructed any new prisons during that time. The members of the Board of Corrections and the DOC Directors have failed their duty to effectively communicate this to the state leaders and obtain sufficient funding to provide constitutional conditions of confinement. They have also failed to implement early release programs to alleviate the problem by releasing inmates who have demonstrated good behavior, or are so old and sick that they are no threat to society. The problem just keeps getting worse and worse.

Prison overcrowding and understaffing has existed in Oklahoma for many years. This is a continuing violation of the 8th Amendment. The continuing violation doctrine applies to 8th

Amendment claims of deliberate indifference brought in a civil rights complaint.  Shomo v. City of New York, 579 F.3d l76 (2nd Cir. 2009).


## CLAIM NUMBER TWO

### DEFENDANTS HAVE IMPOSED CRUEL AND UNUSUAL PUNISHMENT UPON THE PLAINTIFF, IN VIOLATION OF THE 8TH AMENDMENT.

Plaintiff's realization that neither prison officials, state inspectors, state legislators nor political leaders seem to care anything about his conditions of confinement, has caused Plaintiff to experience extreme emotional distress.  Plaintiff has been forced to endure for years truly horrible conditions.  Plaintiff has witnessed numerous assaults on other inmates, and he has himself been assaulted.  He has witnessed almost daily illegal activity, including drug use, assaults, robberies, gambling, tattooing and theft of state property.  Plaintiff has to daily stand in line and wait to use a toilet, sink, shower or telephone.  The noise level in the housing units is ear shattering.  The Correctional Officers and staff members are so outnumbered by the inmates that they seem to be afraid to enforce the rules.

Plaintiff also alleges that the defendants' complained of conduct constitutes the intentional infliction of emotional distress upon him, in violation of state law.  The intentional infliction of emotional distress is prohibited by common law and Article 2, Section 9 of the Oklahoma constitution.  Trentadue v. Lee, 397 F.3d 840 (l0th Cir. 2005); Computer Publications, Inc. v. Welton, 49 P.3d 732 (OK 2002); Goodwin v. Old Republic Ins. Co., 828 P.2d 431, 437 (OK l992).

The above has caused Plaintiff to suffer both mental and physical pain.  Plaintiff has developed stomach problems, possibly an ulcer.  He has severe headaches and cannot sleep normally.  He is in constant fear of being assaulted.  Knowing that no one cares makes this even worse.


## RETALIATION

Prison officials have a long history of retaliating against inmates who file grievances and lawsuits against them.  Plaintiff asks the court to take judicial notice of lawsuits filed by JCCC inmates in this court who have been almost immediately transferred out of retaliation.  None of the following inmates had pending disciplinary write-ups at the time they were transferred.  All are elderly, with no legitimate other reason for being transferred.  At least one JCCC inmate filed suit in this court on the issue of a retaliatory transfer.  Miskovsky v. Jones, Case No. CIV-08-l23-HE.  Inmates transferred more recently include: Wiley Toler, CIV-l3-l025-F;  Travis Greer, #544419, CIV-l4-708-M and CIV-l4-l066-M.  (Inmate Greer was stabbed and almost killed immediately after he was transferred); Logan Bishop, #442020, CIV-ll-660-HE (his family contacted the Governor's office with complaints, and he was immediately transferred);  Lionel Holland, # l68445 (his lawsuit was prepared but not yet filed when he was transferred);  Archie

Rachel, #243980, CIV-14-655-R and CIV-15-141-W; David Callahan, # 196904 (he filed suit through the U.S. Department of Justice); Fred Smith, # 218690, CIV-16-654-HE and CIV-15-1194-HE; Kent Savage, # 646862, CIV-15-670-HE and CIV-16-1194-HE. The court is also asked to take judicial notice that inmates Archie Rachel and Fred Smith filed "Notices of Retaliation" in their above cited cases. Retaliation for exercising a legal right violates the 1st Amendment. Smith v. Maschner, 899 F.2d 940 (10th Cir. 1990).

Plaintiff represents that he has been retaliated against many times over the years due to his constitutional right to file grievances and lawsuits against prison officials. Plaintiff has included claims of retaliation in his previous civil rights complaints filed in this court in case numbers CIV-10-257, CIV-10-769 and in Case No. CIV-12-158 filed in the U.S. District Court for the Eastern District of Oklahoma. Plaintiff has been transferred before out of retaliation.

Plaintiff represents that he has been recently threatened with retaliation in the form of getting a disciplinary write-up and/or being transferred if he continues to file grievances and lawsuits, causing him to not grieve some of the issues raised in this action. This excuses the requirement to exhaust administrative remedies. McBridge v. Lopez, 807 F.3d 982 (9th Cir. 2015).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

Plaintiff asserts that there is no available administrative remedy for the claims raised in this civil rights action regarding any Defendant. The administrative process utilized by the Department of Corrections is grievance policy OP-090124. The enabling state statute is 57 O.S. 566.3(G). When a state agency has no authority to resolve a particular dispute, exhaustion of administrative remedies raises no bar to a court action. That is the situation in this case.

Plaintiff's claims are considered to be "non-grievable" per grievance policy OP-090124. The Department of Corrections cannot print money, and it cannot arbitrarily release enough inmates to resolve the overcrowding problem, thus there is no available remedy. The grievance process provides no method of granting relief against Defendants who are not employed by the DOC. None of the grievance officials processing inmate grievances has the authority to take any action granting an actual remedy.

Additionally, grievance policy OP-090124 is so confusing, complex and labyrinthine that the ordinary prisoner cannot successfully navigate his way through it. This renders the administrative remedy unavailable. Ross v. Blake, 136 S.Ct. 1850 (2016).

## QUALIFIED IMMUNITY

Plaintiff asserts that none of the Defendants are entitled to qualified immunity. Plaintiff has sued all Defendants in both their individual and official capacity. Qualified immunity is not available to individual capacity claims. Plaintiff alleges that the Defendants' complained of conduct was not within the scope of their employment, because they violated clearly established laws. Mitchell v. Forsyth, 472 U.S. 511, 517, 105 S.Ct. 2806 (1985). Moreover, Plaintiff is

seeking injunctive relief, which is prospective in nature.  Qualified immunity is not available for claims for prospective relief.

## PRO SE STATUS

Plaintiff asks the court to provide a liberal construction to his pleadings, and to hold him to a less stringent standard than an attorney, in view of is pro se status.  Hall v. Bellmon, 935 F.2d ll06, lll0 (l0th Cir. 1991).

## STATE LAW CLAIMS

Plaintiff asks the court to exercise its pendant, supplemental jurisdiction under 28 U.S.C. l367 to consider  state law claims made in this case, should the court determine that some claims violate state law, but may not rise to the level of being a violation of the U.S. Constitution.

## DECLARATORY JUDGMENT

Plaintiff seeks a prospective Declaratory Judgment under 28 U.S.C.2201, to the effect that the Defendants have violated his constitutional rights, as set forth above.

## INJUNCTIVE RELIEF

Plaintiff seeks prospective injunctive relief under 28 U.S.C. 2202.  The federal courts may issue injunctions to reduce overcrowding to protect inmates from danger.  Ruiz v. Estelle, 679 F.2d lll5, ll40-42 (5th Cir. 1982); Winton v. Board of Commissioners of Tulsa County, OK 88 F.Supp. l247, l266 (ND OK 2000);  Battle v. Anderson, supra;  Brown v. Plata, supra.

Injunctive relief is especially necessary in this case.  The complained of prison conditions have been in existence for decades, not just years.  It has been common and public knowledge for decades that the Oklahoma Department of Corrections has been grossly overcrowded and understaffed, resulting in a dangerous and unsafe environment for inmates, correctional staff and correctional officers and the public.  Yet corrections leaders and political leaders have steadfastly refused to take appropriate corrective action.

## PUNITIVE DAMAGES

An award of a small amount of monetary damages will do absolutely no good.  It would be ignored, and the status quo would be maintained.  Punitive damages are available when, as in this case, the Defendants' conduct is motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.  Smith v. Wade, 461 U.S. 30, 56 (l983);  Searles v. Van Bebber, 25l F.3d 869 (l0th Cir. 200l).

Punitive damages of a large amount are justified in this case.  The Defendants have shown blatant, reckless and continued callous disregard for many years.  Plaintiff seeks compensatory damages of $200,000 and punitive damages of $2,000,000, in addition to Declaratory Judgment and Injunctive Relief.

**VI.** Declarations:

I declare under penalty of perjury that the foregoing is true and correct.

_Stephen Craig Burnett_                    02-14-17
Stephen Craig Burnett, #224242            Date


I further declare under penalty of perjury that I placed this complaint in the prison's legal mail system, with the correct postage attached, on the _____ day of _____.

_Stephen Craig Burnett_                    _____
Stephen Craig Burnett, #224242            Date

/9